## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN VANCE, | § | |
|       Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0896-S-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
|       Defendant. | § | Referred to U.S. Magistrate Judge[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Stephen Vance (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (*See* docs. 1, 18.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

### I.  BACKGROUND

On June 12, 2019, Plaintiff filed his application for DIB, alleging disability beginning on December 9, 2018. (doc. 15-1 at 151.)[3]  His claim was denied initially on August 19, 2019 (*Id.* at 92), and upon reconsideration on December 16, 2019 (*id.* at 94).  On December 30, 2019, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 98.)  He appeared and testified at a telephonic hearing on September 22, 2020. (*Id.* at 34-62.)  On November 16, 2020, the ALJ issued a decision finding him not disabled. (*Id.* at 14.)

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]At the time this appeal was filed, Andrew Saul was the Commissioner of the Social Security Administration, but Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration on July 9, 2021, so she is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 16, 2020. (*Id.* at 149.) The Appeals Council denied his request for review on February 23, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A.    Age, Education, and Work Experience

Plaintiff was born on September 22, 1967, and was 53 years old at the time of the hearing. (doc. 15-1 at 56, 151.) He had a college degree and could communicate in English. (*Id.* at 165, 167.) He had past relevant work as a web designer/programmer analyst. (*Id.* at 56.)

## B.    Medical, Psychological, and Psychiatric Evidence

In the 1980s, Plaintiff underwent a C1-C2 fusion and an L5-S1 fusion. (*Id.* at 412.) A 2018 cervical MRI showed no significant findings. (*Id.*)

From October 16, 2018 to November 21, 2018, Plaintiff attended neuromuscular therapy sessions at Texas Headache Center (THC). (*Id.* at 330-39.) He complained of persistent severe limitation of range of motion and neck stiffness. (*Id.* at 331.) His musculoskeletal examinations showed significant restriction in head rotation, tilting, and extension, with almost no ability to turn his head, and myofascial restriction of the bilateral temporomandibular region, significant sustained head pull forward, and positive bilateral lesser and greater occipital nerve compression. (*Id.*)

On December 5, 2018, Plaintiff saw Brian Sorin, M.D., at THC for a post-Botox injection follow-up. (*Id.* at 339.) He complained of headaches, stiffness, neck pain, and thoracic/low back pain, with a generalized pain scale of 6/10. (*Id.* at 340.) He reported that Botox was most beneficial during only the first three weeks, but overall he had remarkable improvement with range of motion, migraine frequency, and overall pain intensity. (*Id.*) He estimated having five migraines per month

and chronic daily headaches, but he was functioning well with continued improvement in range of motion. (*Id.*) His physical examination was normal, except for a sustained head pull forward on the right and left neck. (*Id.* at 341.) Plaintiff was diagnosed with cervical dystonia, chronic migraine, headache, cervicalgia, generalized anxiety disorder, essential hypertension, idiopathic orofacial dystonia, and mild cognitive impairment. (*Id.* at 343.)

On January 15, 2019, Plaintiff returned to THC for treatment of symptoms associated with chronic daily headaches, cervical dystonia, and focal dystonia. (*Id.* at 349-54.) He reported two migraines in the last month, but his headaches were gradually improving, and he was more physically active. (*Id.* at 349.) At a follow-up visit on February 27, 2019, Plaintiff reported "great" improvements with headaches and significant decrease in pain, but he continued to experience "stiffness." (*Id.* at 355.)

On February 4, 2019, Plaintiff presented to Progressive Pain & Interventional Psychiatry (PPIP) for cervical myofascial pain with dystonia, bipolar II disorder/attention deficit disorder/posttraumatic stress disorder (PTSD), and migraine headache; he was treated by Howard Cohen, M.D. (*Id.* at 255-57.) He reported moderate pain associated with joint and muscle discomfort, as well as aching and throbbing head and neck pain. (*Id.* at 255.) Dr. Cohen noted that cervical manual testing was adequate, and that Plaintiff was able to be active a limited number of hours a day. (*Id.*) Psychological assessment indicated moderately high symptoms of depression and moderate symptoms of anxiety. (*Id.*) Overall review of systems was normal, except that Plaintiff was positive for muscle pain, back pain, muscle cramps, headaches, and depression. (*Id.* at 256.) He had cervical paraspinal tenderness with restriction, but his extrocular movements and cranial nerves were intact, and he ambulated without antaliga, weakness, or spasticity. (*Id.* at 256-57.)

Plaintiff returned to Dr. Cohen on March 1, March 27, April 24, May 7, May 24, and June 18, 2019. (*Id.* at 238-56, 322-24.) At each appointment, he complained of pain in his muscles, back, head, and neck, headaches, cervical stiffness, and depression. (*Id.* at 238, 241, 244, 247, 252, 322.) He described his pain as moderate in severity, aching and throbbing in quality, and constant in frequency. (*Id.*) His medication regime provided some improvement with his pain and headaches, and he was able to be active a number of hours a day, but he continued to feel upper extremity stiffness. (*Id.*) He had cervical paraspinal tenderness with restriction, but his extraocular movements and cranial nerves were intact; he ambulated without antalgia, weakness, or spasticity, and he did not have clubbing, cyanosis, or edema. (*Id.* at 239, 243, 246, 249, 254, 323.) Cervical manual muscle testing showed flexion deficits on March 27 and May 7, 2019. (*Id.* at 241, 247.) During mental examinations, Plaintiff was alert and oriented to all spheres, with appropriate affect, unremarkable speech and behavior, grossly intact memory and concentration, good insight and judgment, and average I.Q. (*Id.* at 239, 242-43, 245-46, 248, 253, 323.) His psychological assessments indicated moderate to high depressive symptoms and mild to moderate anxiety symptoms. (*Id.* at 238, 241, 244, 247, 252, 322.) On March 27, 2019, Dr. Cohen diagnosed Plaintiff with chronic major depression. (*Id.* at 247.)

On July 2, 2019, Plaintiff presented to Dr. Timm at THC for a follow-up appointment. (*Id.* at 393-99.) He reported that his headaches were well-controlled with his current neurotoxin treatment, and that his headaches were daily but did not progress to migraines. (*Id.* at 397.) He was doing okay with Dysport but continued experiencing cervical stiffness. (*Id.* at 398.) Examination showed that he had sustained head pull forward at the left and right neck and significant restriction in head rotation, head tilting, and head extension. (*Id.* at 396.) Dr. Timm opined that his symptoms

4

were consistent with acquired dystonic reaction after an odontoid fracture and cervical fusion. (*Id.* at 393.)

On July 17, 2019, Susan Swank, M.Ed., provided a medical source statement for Plaintiff. (*Id.* at 410.) It stated he had been in psychotherapy with her for many years for depression, anxiety and PTSD, and that his physical problems were increasing in severity when he left therapy for financial reasons in October 2018. (*Id.*)  It was her opinion that he could "no longer proceed with his career." (*Id.*)

On August 15, 2019, State Agency Medical Consultant (SAMC) Jeanine Kwun, M.D., completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (*Id.* at 67-72.)  She opined that Plaintiff had the physical RFC to perform light work with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit for about 6 hours in an 8-hour workday; push and pull unlimited weight (other than shown for lift and carry); and occasional bilateral overhead reaching. (*Id.* at 69-70.)  Dr. Ligon opined that Plaintiff's alleged symptoms were partially supported by the evidence of record.  (*Id.* at 89.)  On December 16, 2019, Robin Rosenstock, M.D., another SAMC, examined the medical record and completed a physical RFC that mirrored Dr. Kwun's physical RFC. (*Id.* at 79-80.)

On August 17, 2019, State Agency Psychological Consultant (SAPC) Matthew Snapp, Ph.D., completed a Psychiatric Review Technique (PRT). (*Id.* at 67-68.)  He opined that Plaintiff had mild difficulties in adapting or managing himself but no difficulties with understanding, remembering, or applying information; interacting with others; or concentrating, persisting, or maintaining pace. (*Id.*)  He also opined that Plaintiff's allegations of depression, anxiety, and PTSD were not supported by the medical evidence of record. (*Id.* at 68.)

On October 29, 2019, Plaintiff presented to Intergrative Pediatric Therapy (IPT) for physical therapy (PT) evaluation. (*Id.* at 412-22.)  He complained of brain fog, slow processing speed, poor balance, trouble sleeping, global stiffness, auditory sensitivity, poor visual tracking to his right side, and severe headaches. (*Id.* at 420.)  Clinical examination showed global decreased range of motion in his lower extremities and thoracic and cervical spine, very poor balance across a variety of testing conditions, and occulomotor challenges. (*Id.*)

Plaintiff returned to IPT for five CranioSacral Therapy sessions between October 31, 2019 and November 15, 2019. (*Id.* at 453-70.)  His mid-thoracic spine was very rigid, and he had difficulty with balancing and head turns, but he responded well to manual therapy intervention. (*Id.* at 453, 462.)

On November 12, 2019, Plaintiff presented to Jennifer Sauls, FNP, at PPIP for chronic pain and mood. (*Id.* at 434-38.)  He complained of widespread pain in the head and cervical spine that was moderate in severity and aching in context. (*Id.* at 434.)  He was able to fulfill daily home responsibilities but struggled. (*Id.*)  He denied having severe depression but had difficulty thinking. (*Id.*)  His migraine headaches were fairly stable with his current medication regimen. (*Id.* at 434-35.)

On December 15, 2019, SAPC Matthew Wong, Ph.D, completed a PRT. (*Id.* at 77-78.)  He opined that Plaintiff had mild difficulties with understanding, remembering, or applying information and interacting with others, and moderate difficulties with concentrating, persisting, or maintaining pace and adapting or managing oneself. (*Id.*)  Dr. Wong also completed a mental RFC assessment, opining that Plaintiff could understand, remember, and carry out detailed but not complex instructions; make decisions; concentrate for extended periods; interact with others; and respond to changes. (*Id.* at 80-82.)

On nine occasions between January 13 and July 23, 2020, Plaintiff visited Jill Rice, N.P., at PPIP for migraines, chronic headache disorder, chronic pain syndrome, isolated cervical dystonia, and recurrent major depression. (*Id.* at 489-539.)  Each time, he reported moderate to severe pain in his back, chest, face, head, and neck. (*Id.* at 493, 499, 511, 522, 528, 533, 538.)  His physical examinations were normal, except for decreased range of motion of the cervical spine with tenderness in the cervical para spinal musculature. (*Id.*)  Mental examinations indicated appropriate mood and affect, logical and relevant thought processes, and normal thought content, recent and remote memory, attention span, and concentration ability. (*Id.*)  In April and May 2020, he reported poor tolerance of prolonged positions and activities due to pain, and inability to work due to issues with focus and concentration, reading comprehension, as well as whole body stiffness pain. (*Id.* at 507, 513, 519.)  In June and July 2020, he reported improvement with PT. (*Id.* at 489, 495, 501.)

On July 16, 2020, Plaintiff presented to Ronald Paulman, Ph.D., for a neuropsychological evaluation. (*Id.* at 554-63.)  Dr. Paulman noted that Plaintiff was of average intelligence and exhibited mild, isolated neurocognitive impairment/variability when compared to age and education peers. (*Id.* at 559.)  He was within normal limits in his executive processing abilities under less structured problem conditions requiring trial-and-error learning and use of performance feedback, and he had intact receptive and speech. (*Id.* at 559-60.)  He was capable of acquiring and retaining redundant information that was presented orally, but he was vulnerable to insertion of irrelevant material in his memory recall, which lowered the reliability of his verbal memory. (*Id.* at 560.)  Dr. Paulman opined that Plaintiff's performance during the testing process supported his cognitive issues at work and were likely associated with pain engendered by sitting for extended periods or neck positions. (*Id.*)  He opined that Plaintiff had the cognitive ability to perform in a familiar work

role, but he was limited "in his mental efficiency and stamina with additional problems seen with his executive/organizational and memory skills," and was at risk for under-performing as a result of his current cervical and headache problems. (*Id.*)

On August 5, 2020, Plaintiff reported migraines for the seven days after his neuropsychological evaluation. (*Id.* at 562.) Dr. Paulman opined that this highlighted the association between Plaintiff's "cognitive and work capacities and state changes brought on by routines leading to cervical pain/immobility and headache issues." (*Id.*)

At a visit with NP Rice on August 13, 2020, Plaintiff reported more stiffness and headaches, and he felt the PT sessions caused him to get "inflamed at times." (*Id.* at 565.)  His neuropsychological testing report revealed that the biggest limitation on his work performance was his inability to withstand prolonged positions and activities, but he was expected to improve over time with continued treatment of his dystonia with PT. (*Id.*) She also noted that his cognitive function limitation was found to be due to pain and should resolve when his pain resolved. (*Id.*)

## C.    <u>Hearing</u>

On September 22, 2020, Plaintiff and a vocational expert (VE) testified at a telephonic hearing before the ALJ. (*Id.* at 34-62.)  Plaintiff was represented by an attorney. (*Id.* at 36.)

### 1.    **Plaintiff's Testimony**

Plaintiff testified that he was married with two daughters, aged five and eight. (*Id.* at 39.) In December 2018, he stopped working because his company was downsizing and he was terminated. (*Id.* at 41.)  He was unable to work because he had difficulty concentrating and focusing due to migraines and stiffness in the neck, body, and shoulders. (*Id.* at 41-43.)  At one time, he did not go to the office for two months because he was struggling with head pain and concentration. (*Id.*

at 43.)  When he was working, he was experiencing migraines on a daily basis, but his migraine headaches had improved since starting psychotherapy. (*Id.* at 44-46.)  He was able to help with chores around the house and to help his children with their homework, but he would get migraines if he overexerted himself. (*Id.* at 44-46.)

When experiencing a migraine, he would be "laid out" for two to three days and slowly increased his activity level after feeling better. (*Id.* at 49-50.)  His migraines would be triggered after looking at a computer for more than 30 minutes or by activities that required him to look or bend his head down for a long time. (*Id.* at 50)  He tried Botox for nine months but it did not do anything for him. (*Id.* at 51.)  He did not have trouble getting along with people, but struggled with concentration, cognition, and short term memory. (*Id.* at 53.)

### 2.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a web designer/programmer analyst, which was skilled, sedentary work with a SVP of 7. (*Id.* at 55-56.)  A hypothetical person with the same age, education, and work experience history as Plaintiff would not be capable of performing his past work if he was limited to simple, routine, and unskilled light work with occasional climbing of stairs, stooping, balancing, kneeling, crouching, and crawling, but no ladders or hazards such as heights and moving parts. (*Id.* at 57.)  There were other available light jobs with an SVP of 2 that the hypothetical person could perform, including marker with 226,000 jobs nationally, order caller with 81,700 jobs nationally, and routing clerk with 123,300 jobs nationally, which were consistent with the descriptions in the Dictionary of Occupational Titles. (*Id.* at 57-58.)  If the same hypothetical person required a 10 minute break after 30 minutes of activity, he would not be able to maintain and sustain any job in the national economy. (*Id.* at 59-60.)

D.    **ALJ's Findings**

The ALJ issued a decision denying benefits on November 16, 2020. (*Id.* at 16-29.)  At step one, he found that Plaintiff had met the insured status requirements through December 31, 2024, and had not engaged in substantial gainful activity since the alleged onset date of December 9, 2018. (*Id.* at 18.)  At step two, the ALJ found that he had the following severe impairments: major depressive disorder, generalized anxiety disorder, PTSD, bipolar disorder, attention deficit hyperactivity disorder (ADHD), migraines, chronic pain syndrome, myofascial pain syndrome, and status-post cervical and lumbar fusions. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 19.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations: occasionally climb stairs, stoop, balance, kneel, crouch, and crawl; never climb ladders or be exposed to hazards, such as heights or moving parts; and limited to simple routine (unskilled) work. (*Id.* at 21.)  At step four, he found that Plaintiff was unable to perform his past work as a web designer/programmer analyst. (*Id.* at 27.)  At step five, the ALJ found that although Plaintiff was not capable of performing past relevant work, considering his age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 28.)  Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from December 9, 2018, the alleged onset date, through the date of his decision. (*Id.* at 31.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*,

954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point

during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant

satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step

five to show that there is other gainful employment available in the national economy that the

claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either

by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational

testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A

finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.  The ALJ found that the Plaintiff suffers from severe impairments. He defined such impairments as ones which would limit an individual's ability to perform basic work activities. Yet, having found that the Plaintiff has such impairments, the ALJ failed to include functional limitations into his residual functional capacity (RFC) determination consistent with these impairments. Did the ALJ properly determine the Plaintiff's RFC even though he failed to include limitations based upon all of the impairments which he deemed to be severe?

    The Plaintiff contends that the answer is "No."

2.  State Agency medical consultants determined that Plaintiff had significant manipulative limitations. The ALJ never recognized these opinions, considered these limitations, nor did the ALJ explain why he refused to include such limitations into his RFC determination. Did the ALJ properly consider medical opinion evidence in determining Plaintiff's residual functional capacity?

    The Plaintiff maintains that the answer is "No."

(doc. 18 at 2.)

### IV.  RFC ASSESSMENT

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. (doc. 18 at 4.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th

Cir. 1988) (per curiam).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [ALJ's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the ALJ, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous

14

absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

## A.    <u>Physical Impairments</u>

Plaintiff contends that the ALJ failed to include any functional limitations to accommodate for his physical impairments, including his cervical spine limitations and migraine headaches. (doc. 18 at 6-7.)

Here, after considering the evidence of record, the ALJ determined that Plaintiff had the physical RFC to perform light work, except he could occasionally climb stairs, stoop, balance, kneel, crouch, and crawl, and never climb ladders or be exposed to hazards, such as heights or moving parts. (doc. 15-1 at 21.) The ALJ referenced and directly considered the treatment records and the medical findings and opinions of Plaintiff's treating physicians and the SAMCs when determining his RFC. (*See id.* at 22-27.)

Plaintiff's longitudinal medical records indicated that he consistently complained of headaches, migraines, moderate pain associated with joint and muscle discomfort, and cervical stiffness. However, he was in no acute distress, his cranial nerves were intact, he ambulated without antalgia, weakness, or spasticity, his muscle strength was normal throughout, sensation was grossly intact, and he had normal gait and station. (*Id.* at 23-24.) The ALJ referenced Dr. Cohen's treatment notes from a June 2019 medical visit, which noted that Plaintiff had moderate pain that worsened with activity and stress. (*Id.* at 23.) His review of systems was positive for muscle pain, back pain, muscle cramps, and headaches, but was negative for decreased muscle strength, difficulty walking, or limp. (*Id.*) Plaintiff had reported that his migraines seemed better when he was taking his medication regularly. (*Id.*)

15

The ALJ also referenced Dr. Timm's clinical notes from a July 2019 medical visit, which indicated that Plaintiff had sustained head pull forward at the left and right neck, as well as significant restriction in head rotation, head tilting, and head extension, but no limp pain, joint pain, swelling, or gait abnormality. (*Id.*)  Dr. Timm opined that Plaintiff appeared to be doing well with his treatment plan regarding cervical stiffness. (*Id.* at 23-24.)  Although Plaintiff reported having daily headaches, they did not progress to migraine and had been well-controlled with his current neurotoxin treatment. (*Id.*)

The ALJ considered the July 2020 neuropsychological evaluation by Dr. Paulman, which indicated that Plaintiff was still "pretty limited" in terms of activity tolerance and had poor tolerance of prolonged positions and activities. (*Id.* at 24.)  Nevertheless, Plaintiff reported that he was able to self-manage activities of daily living and to engage in some homemaking tasks, and that he was not experiencing current headaches, which suggested that his "physical limitations [were] no greater than what the residual functional capacity statement account[ed] for." (*Id.*)  Additionally, the ALJ referenced the medical findings of the SAMCs and found their light work limitation persuasive because it was consistent with the record; he found the limitation on overhead reaching not persuasive because  medical examinations did not show physical limitations in Plaintiff's upper extremities. (*Id.* at 25-26.)

Plaintiff argues that the medical record establishes that he had almost no rotation of the cervical spine, sustained head pull forward and downward, and poor tolerance for sitting and remaining in prolonged positions, but the ALJ failed to include limitations in either cervical range of motion or in flexion and extension of the cervical spine. (doc. 18 at 6.)  He also argues that the ALJ acknowledged that migraines limited his ability to perform basic work activities, but "there is

nothing in the ALJ's RFC determination which appears to make any accommodation for [his] migraine episodes, nor for his daily headaches." (*Id.* at 7.)

Substantial evidence, particularly the treatment records, support the ALJ's findings on Plaintiff's physical limitations in the RFC, and the ALJ did not err by rejecting his reported limitations. As discussed, the ALJ considered the medical evidence in the record when determining Plaintiff's physical RFC. (*See* doc. 15-1 at 23-24.) He noted that Plaintiff had showed decreased range of motion of the cervical spine and restriction in head rotation, head tilting, and head extension, but that he was doing well with his treatment plan with regard to cervical stiffness. (*Id.*) After considering the totality of these symptoms, he determined it was reasonable to limit Plaintiff to "light work with some postural and environmental limitations." (*Id.* at 23.) .

The ALJ also noted that the frequency of migraines and severity of headache symptoms were well-managed with his current medication regimen, and that his migraines were accounted for "in the limitation to light work, the limitation to never climbing ladders, and the limitation to never having exposure to hazards such as heights or moving parts, as well as with the mental limitations." (*Id.*) He explained that the record did not support additional limitations, as Plaintiff's "subjective reports of disabling physical symptoms [were] not entirely consistent with [his] treatment records, including the objective medical evidence." (*Id.*) The ALJ did not err when assessing Plaintiff's ability to perform work because he was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)).

Because the ALJ relied on medical evidence in the record in making his RFC determination,

his assessment was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting that in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Remand is not required on this issue.[4]

## B.    Mental Impairments

Plaintiff contends that the ALJ failed to incorporate limitations consistent with his recognized severe impairment of ADHD. (doc. 18 at 8.)

As noted, a reviewing court must defer to the ALJ's decision when substantial evidence supports it. *Leggett*, 67 F.3d at 564. In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Id.* (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)); *see also Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994). Likewise, the substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision. *Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986). An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. *See Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993). There is no general duty to explain or provide rational and logical reasons for a decision, however. *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases). The

---

[4]Plaintiff also contends that the ALJ "failed to include dystonia as a severe impairment," but he did not list this argument as one of his issues for review, or separately brief this argument. (*See* doc. 18 at 6.) Nevertheless, even assuming that the ALJ erred in failing to find that his dystonia was a severe impairment, the error was harmless because he proceeded beyond step two. *See Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010) (noting the ALJ's failure to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later steps of the analysis); *see, e.g., Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain why he found only certain impairments to be severe, the error was harmless where he proceeded with the sequential evaluation process).

regulations require only that an ALJ consider and evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record. *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

Here, the ALJ clearly considered the medical evidence in the record regarding Plaintiff's ADHD when determining his RFC. (*See* doc. 15-1 at 24-25.) He noted that Plaintiff had been diagnosed with ADHD, and that he reported having poor concentration since high school and not doing well on tests with time constraints. (*Id.* at 24.) According to the medical records, Plaintiff's mental status examinations were mostly consistent throughout treatment: he was alert, oriented, and well-groomed; his immediate, recent, and remote memory were intact; he was aware of current events and past history; he had good eye contact; and his speech, vocabulary, attention span, and concentration were normal. (*Id.* at 24-25.)

The ALJ considered Dr. Paulman's neuropsychological evaluation, which indicated that Plaintiff was "mildly impaired in speed at completing and alternating number-letter sequencing tasks assessing set-shifting" and had made "two errors consistent with loss of set or train of thought." (*Id.* at 24.) Although he reported having problems formulating thoughts, he also continued to write poetry, which the ALJ noted as "further evidence that he retain[ed] a significant ability to concentrate in spite of his limitations." (*Id.* at 25.) Dr. Paulman found that Plaintiff was "generally average in his overall learning and recall of a lengthy unstructured word list," "average in immediate recall of a complex figure," and "low average following a delay," and that he was "capable of acquiring and retaining a normal, low average, amount of orally presented information." (*Id.*)

19

The ALJ determined that based on the totality of Plaintiff's mental symptoms, "including having poor concentration, not doing well with time constraints, and having problems formulating his thoughts, as well as the symptoms of [his] migraines," his RFC included the limitation for simple routine (unskilled) work. (*Id.* at 24.)  He noted that "further mental limitations" were not warranted, as Plaintiff's subjective reports of disabling mental symptoms were not entirely consistent with his treatment records, including the objective medical evidence. (*Id.*)

Because the ALJ relied on medical evidence in the record in making his RFC determination, his assessment regarding Plaintiff's mental limitations was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236.  To the extent that Plaintiff complains of the failure to include more restrictive mental limitations, the ALJ did not err, and remand is not required on this issue.

## C.    SAMC Opinions

Plaintiff contends that the ALJ erred when he failed to consider and include in his RFC the functional limitations described by the SAMCs. (doc. 18 at 9-10.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from his medical sources." *Id.* §§ 404.1520(a)(3), 404.1520c(a).  The guidelines provide that the ALJ will explain in his determination or decision how persuasive he finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* § 416.920c(b).  Five factors are considered in evaluating the persuasiveness of the medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization;

and (5) other factors which "tend[s] to support or contradict the opinion." *Id.* § 404.1520c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *Id.* § 404.1520c(a). The ALJ will "explain how he considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." *Id.* § 404.1520c(b)(2). He may, but is not required to, explain how he considered the remaining factors. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors," but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. *Id.* § 416.920c(b)(1). Although state agency medical consultants, or SAMCs, are considered experts in Social Security disability determination, and the ALJ must evaluate the persuasiveness of their opinions when assessing the claimant's RFC, the sole responsibility for a disability determination rests with the ALJ. *See Newton*, 209 F.3d at 455; *see also* SSR 96-6p, 1996 WL 374180, at *4.

Here, the ALJ considered the SAMCs' medical findings, including their opinions that Plaintiff was capable of light work with occasional bilateral overhead reaching. (doc. 15-1 at 25.) He found their opinions persuasive insofar as they limited Plaintiff to light work, as this was consistent with the record, but he found the portion of their opinions regarding the overhead reaching limitations not persuasive because they were not supported by the record. (*Id.* at 25-26.) He noted that Plaintiff's examinations indicated that he had decreased range of motion of the cervical spine, but they did not indicate that he had limitations in his upper extremities and "merely

state[d] that his extremities had no clubbing, cyanosis, or edema." (*Id.* at 26.)  The ALJ's RFC limited Plaintiff to light work with no additional limitations for overhead reaching. (*Id.* at 21.)

Substantial evidence supports the ALJ's RFC and the rejection of the overhead reaching limitations of both SAMCs.  After considering the medical evidence in the record, including the treatment records, as well as the opinions of Plaintiff's treating physicians and the SAMCs, the ALJ identified the SAMC findings that were supported by the medical evidence of Plaintiff's physical impairments, and included RFC limitations consistent with those findings. (*See* doc. 15-1 at 21, 25-26.)  As discussed, the ALJ is "free to reject the opinion of any physician when the evidence support[ed] a contrary conclusion." *Newton*, 209 F.3d at 455.  Furthermore, it is entirely within the ALJ's purview to resolve any conflicts in the evidence because such conflicts are for the Commissioner, and not the courts, to resolve. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  Although Plaintiff complains that no explanations were provided for not including overhead reaching limitations, the ALJ's RFC decision can be supported by substantial evidence even if he did not specifically discuss all the evidence that supported his decision or all the evidence that he rejected. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *Hunt v. Astrue*, No. 4:12-CV-244-Y, 2013 WL 2392880, at *7 (N.D. Tex. June 3, 2013) ("The ALJ is not required to discuss every piece of evidence in the record nor must the ALJ follow formalistic rules of articulation.").

Because substantial evidence supports the ALJ's rejection of the opinions of the SAMCs on bilateral overreaching limitations, remand is not required on this issue.

## V.  RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED**, on this 8th day of August, 2022.

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

    A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

23